[Cite as *State ex rel. Humility of Mary Health Partners v. Indus. Comm.*, 2015-Ohio-4456.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. | : | |
| Humility of Mary Health Partners, | | |
| | : | |
| Relator, | | |
| | : | No. 14AP-965 |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio and | | |
| Dieldra L. Penny, | : | |
| | | |
| Respondents. | : | |

D E C I S I O N

Rendered on October 27, 2015

*Day Ketterer, Ltd., Jerry P. Cline*, and *Thomas R. Wyatt*, for relator.

*Michael DeWine*, Attorney General, and *Natalie J. Tackett*, for respondent Industrial Commission of Ohio.

*Nurenberg, Paris, Heller & McCarthy Co., L.P.A., Benjamin P. Wiborg, Ellen M. McCarthy*, and *Brenda M. Johnson*, for respondent Dieldra L. Penny.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

SADLER, J.

{¶ 1} Relator, Humility of Mary Health Partners, brings this original action seeking a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its October 5, 2012 order awarding permanent total disability ("PTD") compensation to respondent Dieldra L. Penny ("claimant").

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who rendered a decision and recommendation that includes findings of fact and conclusions of law, which is appended hereto. The magistrate concluded that the commission did not abuse its discretion in awarding PTD compensation. Accordingly, the magistrate recommended that we deny the requested writ of mandamus.

{¶ 3} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986).

{¶ 4} Relator sets forth the following three objections to the magistrate's decision:

> [1.] The Magistrate erred when she concluded that Catalyst's offer of training and employment cannot constitute a vocational rehabilitation program.
>
> [2.] The Magistrate Failed to Cite to Any Authority to Support Her Conclusion that HMHP was Required to Seek the Approval of Respondent's treating Psychologist Before Referring Penny to Vocational Rehabilitation.
>
> [3.] The Magistrate erred by rejected [sic] HMHP's argument that Dr. Weinstein's April 15, 2014 report cannot constitute some evidence and ignored Penny's own deposition testimony.

{¶ 5} Claimant's industrial claim is allowed for lumbosacral strain, L5-S1 disc herniation, major depressive disorder, Cauda Equina Syndrome with neurogenic bladder, neurogenic bowel, left foot drop, and anxiety disorder due to Cauda Equina Syndrome with neurogenic bladder. Because of the allowed condition of Cauda Equina Syndrome with neurogenic bladder, claimant must catheterize herself four to five times daily. Because of the allowed condition of neurogenic bowel, claimant has frequent bowel

accidents. Claimant's physical symptoms have resulted in the allowed psychological conditions for which she has received counseling and drug therapy.

{¶ 6} Following claimant's application for PTD compensation, relator, by and through Catalyst RTW ("Catalyst"), offered claimant vocational training, after which she was to be interviewed for a home-based employment position with a company known as AllFacilities, Inc.

{¶ 7} On April 15, 2014, claimant's treating psychologist, D. Weinstein, Ph.D., authored a report wherein he opined that claimant was incapable of engaging in sustained remunerative employment of any kind and that she was permanently and totally disabled. Thereafter, the commission referred claimant to a psychologist by the name of David L. Chiarella, Ph.D., who examined claimant and issued a report on May 28, 2014. Therein, Dr. Chiarella opined that claimant is permanently and totally disabled due to her allowed psychological conditions.

### First Objection

{¶ 8} In its first objection, relator contends that the magistrate erroneously concluded that Catalyst's offer of training and employment did not qualify as a vocational rehabilitation program. Our review of the magistrate's decision reveals that, although the magistrate expressed criticism of the tactics employed by Catalyst in this case, the magistrate did not conclude that relator's offer of training and employment could not also be considered a vocational rehabilitation program. Moreover, the commission based its award of PTD compensation solely on the allowed psychological conditions in the claim and the reports of both Drs. Weinstein and Chiarella. The magistrate's decision provides, in relevant part:

> In the present case, the commission awarded claimant PTD compensation based solely on her allowed psychological conditions. In so doing, the commission relied on two pieces of evidence: the February 15, 2014 report of Dr. Weinstein and the May 28, 2014 report of Dr. Chiarella. It is undisputed that, when the commission determines that a claimant is entitled to an award of PTD compensation based solely on the allowed conditions in the claim, the commission is not required to analyze the non-medical disability factors under [*State ex rel.*] *Stephenson* [*v. Indus. Comm.*, 31 Ohio St.3d 167 (1987)]. Further, the commission can determine, based on

> the evidence before it, that a claimant was not capable of participating in vocational rehabilitation thereby obviating the need for a claimant to have first sought out vocational rehabilitation before applying for PTD compensation. The commission can find that such action would be in vain. *See* R.C. 4123.58(D)(4) and *State ex rel. Galion Mfg. Div. Dresser Industries, Inc. v. Haygood*, 60 Ohio St.3d 38 (1991).

(Magistrate's Decision, ¶ 59.)

{¶ 9}   The reports issued by Drs. Weinstein and Chiarella provide some evidence to support the commission's PTD award. *State ex rel. Rouch v. Eagle Tool & Machine Co.*, 26 Ohio St.3d 197, 198 (1986).  This being the case, the issue of vocational training is irrelevant to the PTD determination. *State ex. rel. Galion Mfg. Div., Dresser Industries, Inc. v. Haygood*, 60 Ohio St.3d 38 (1991)*.  See also State ex rel. Humility House v. Indus. Comm.*, 10th Dist. No. 03AP-1, 2003-Ohio-5582, ¶ 6 ("An evaluation of the non-medical/vocational factors is not necessary when the claimant is medically unable to perform any sustained, remunerative employment.").   Accordingly, relator's first objection is overruled.

### Second Objection

{¶ 10} For similar reasons, we overrule relator's second objection.  In its second objection, relator claims that the magistrate failed to cite any legal authority for her conclusion that relator was required to obtain approval of claimant's treating psychologist before making an offer of employment.  Given the fact that both Drs. Weinstein and Chiarella opined that claimant's allowed psychological conditions support the commission's PTD award, the question of vocational training is irrelevant to the PTD determination. *Galion*; *Humility House.*  Accordingly, relator's second objection is overruled.

### Third Objection

{¶ 11} In its third objection, relator claims that the magistrate erroneously rejected its argument that Dr. Weinstein's April 15, 2014 report must be disregarded inasmuch as claimant misrepresented the requirements of the position she was offered.  First, we reject relator's contention the Dr. Weinstein's opinion was limited to claimant's capability of performing the duties of the job offered to her by Catalyst.  Dr. Weinstein's April 15, 2014 report states:

> Again, let me reiterate, I believe Ms. Penny is incapable of performing this *or any other job*, and I consider Ms. Penny to be permanently and totally disabled and not capable *of any form of gainful competitive employment* * * * due to her emotional status and the impairments of Major Depressive Disorder Single Episode Mild; Anxiety Disorder due to cauda equina syndrome with neurogenic bowel and bladder disorder.

(Emphasis added.)  (Magistrate's Decision, ¶ 42.)

{¶ 12} Given Dr. Weinstein's opinion, the question of whether claimant misrepresented the duties required of her by the position offered by Catalyst is of no consequence.  Moreover, even if we were to exclude Dr. Weinstein's report from consideration, we agree with the magistrate's conclusion that "the report of Dr. Chiarella, standing alone, supports the commission's order * * * and renders discussion of relator's other argument immaterial."  (Magistrate's Decision, ¶ 61.)  Accordingly, relator's third objection is overruled.

{¶ 13} Following review of the magistrate's decision, an independent review of the record, and due consideration of relator's objections, we find that the magistrate has determined the pertinent facts and properly applied the relevant law.  Accordingly, we overrule relator's objections and adopt the magistrate's decision as our own, including the findings of fact and the relevant conclusions of law as identified herein.  The requested writ is of mandamus is denied.

*Objections overruled;*
*writ of mandamus denied.*

BROWN, P.J., and BRUNNER, J., concur.

_____

**A P P E N D I X**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Humility of Mary Health Partners, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No.  14AP-965 |
| | : | |
| Industrial Commission of Ohio and Dieldra L. Penny, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on June 24, 2015

---

*Day Ketterer, LTD., Jerry P. Cline* and *Thomas R. Wyatt,* for relator.

*Michael DeWine*, Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

*Nurenberg, Paris, Heller & McCarthy Co., L.P.A., Benjamin P. Wiborg, Ellen M. McCarthy* and *Brenda M. Johnson,* for respondent Dieldra L. Penny.

---

IN MANDAMUS

{¶ 14} Relator, Humility of Mary Health Partners, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order which granted permanent total

disability ("PTD") compensation to respondent, Dieldra L. Penny ("claimant"), and ordering the commission to find that she is not entitled to that compensation.

Findings of Fact:

{¶ 15} 1. Claimant was employed as a lab assistant at a medical facility operated by relator when she sustained a back injury on July 13, 2004 while attempting to catch a falling lab specimen. Claimant's workers' compensation claim is allowed for the following conditions:

> Major depressive disorder; Cauda Equina Syndrome with neurogenic bladder; neurogenic bowel; left foot drop; anxiety disorder due to Cauda Equina Syndrome with neurogenic bladder.

{¶ 16} 2. Claimant underwent microdiscectomy at L5-S1 in October 2006 and June 2009. Following the second surgery, claimant developed numbness in her lower extremities and, subsequently, developed incontinence, and was diagnosed with Cauda Equina Syndrome and Neurogenic bladder and bowel. As a result, claimant must catheterize herself four to five times a day and has frequent bowel accidents. Further, because of associated psychological problems, claimant's claim was also allowed for major depressive disorder and anxiety disorder.

{¶ 17} 3. Claimant received temporary total disability ("TTD") compensation following her injury and has not worked since the date of her injury.

{¶ 18} 4. On December 15, 2009, Matthew McDaniel, M.D., performed an independent medical examination of claimant at relator's request to determine whether or not she had reached maximum medical improvement ("MMI"). Dr. McDaniel listed the allowed conditions in her claim, identified the medical records which he reviewed, included claimant's statements in his physical findings upon examination, and concluded that she required additional rehabilitation for gait training and strengthening, and was not at MMI.

{¶ 19} 5. Near this time, relator had claimant under surveillance. When the surveillance tape was provided to Dr. McDaniel, he prepared an addendum dated February 8, 2010. He concluded:

> The surveillance video does change my opinions. Ms. Penny's true clinical presentation is now called into question.

Ms. Penny has related to me on both independent examinations that she is in constant severe pain, severely limited in activities of daily living, unable to lift or bend, unable to walk without assistance, and limited in socializing outside the home. Obviously, the video presents a completely different picture.

In the video, Ms. Penny displays entirely normal physical capacities. She walks, bends, lifts, and moves in a fluid, physiologic manner with no apparent difficulties, standing in direct contrast to her stated complaints and clinical presentation at the independent medical examinations. She is not using a cane. She is apparently active outside her home.

Ms. Penny's physical abilities in the video do not correlate with her stated dependence on her husband, near home-bound status, need for a cane for ambulation, and need for a motorized cart.

In summary, Ms. Penny's clinical presentation to me and her presentation in the video represent an obvious discrepancy. Therefore, relying on the normal physical capacities observed in the video, the allowed conditions would be at Maximum Medical Improvement.

{¶ 20} 6. Based on Dr. McDaniel's addendum report, relator sought to have claimant's TTD compensation terminated.

{¶ 21} 7. Based upon Dr. McDaniel's February 8, 2010 addendum report, claimant's TTD compensation was terminated effective April 12, 2010 and an overpayment was declared.

{¶ 22} 8. Claimant was later awarded a new period of TTD compensation beginning in August 2011 based solely upon her allowed psychological conditions. The commission specifically relied on reports by relator's evaluating psychologist R. Litwin, as well as the report of claimant's treating physicians A. Nalluri, M.D., and D. Weinstein, Ph.D. All three doctors noted that claimant had regular panic attacks, difficulty leaving the house, that concerns over her incontinence cause significant embarrassment and anxiety symptoms, and rendered her temporarily and totally disabled.

{¶ 23} 9. Claimant began treating with Dr. Weinstein in January 2013.[1] Claimant received TTD compensation for the allowed psychological conditions until it was terminated on November 22, 2013 after a district hearing officer ("DHO") found that her allowed psychological conditions had reached MMI.

{¶ 24} 10. Shortly before her allowed psychological conditions were found to be MMI, claimant filed her application for PTD compensation. At the time, claimant was 51 years of age and had begun receiving Social Security Retirement Benefits in the amount of $972 in July 2009. Claimant indicated that she was a high school graduate and had completed two years of college at Youngstown State University.

{¶ 25} 11. Regarding her allowed physical conditions, relator submitted the August 8, 2013 report of her treating physician John L. Dunne, D.O., who stated:

> Mrs. Penny has been a long-standing patient of mine and had developed a cauda equina syndrome, neurogenic bowel and bladder, and a left foot drop as a result of an L5-S1 disc herniation that was operated too late. Despite everyone's best efforts and the work of a number of university consultants in Pittsburgh, these conditions have not resolved. Mrs. Penny continues to experience bowel and bladder incontinence on a frequent weekly to daily basis. She continues to have foot drop. She continues with low back pain and left leg pain. She is significantly restricted from all activities of daily living such as heavy household cleaning, prolonged standing and lifting activities. She is able to drive. She will at times utilize a cane for support if her left leg is bothering her or is weaker more. But in my opinion, her limitations and impairment solely as a result of the injuries of this claim and sequelae have rendered her permanently and totally unable to participate in sustained remunerative employment on a permanent basis.

{¶ 26} 12. Concerning her allowed psychological conditions, claimant submitted the December 17, 2013 report of Dr. Weinstein:

> Ms. Penny has ongoing issues with incontinence and coping with her neurogenic bladder. She has been doing home self-catheterizations with the help of her spouse 4-5 times a day since 2009. She has continued complications with not being

---

[1] According to relator, claimant began treating for her psychological conditions with Dr. Weinstein after Dr. Anil Nalluri plead guilty to defrauding the Ohio Bureau of Workers' Compensation ("BWC").

able to fully empty her bladder and having several urinary tract infections, resulting in emergency room visits due to pain. She continues to experience pain. * * * She has been experiencing increasing problems with sexual intimacy, soiling herself, and needing to bathe more often to optimize cleanliness. This has led to an increase in panic attacks, tension, and social embarrassment and withdrawal from others. Ms. Penny wears Depends and is on many different medications for pain, mood, and bladder control.

* * *

Psychologically, Ms. Penny continues to experience 2-3 panic attacks per week with physical symptoms. She struggles with social isolation due to her medical conditions and the embarrassment associated with her medical conditions. "I was told to try to get out more ... I did it for about a week but then reverted back to my home." She also described severe problems with nervousness, depression, trembling, feeling tense, and feeling panicky.

* * *

Due to the failures of her surgeries and her physical conditions deteriorating, Ms. Penny began to feel depressed. She was referred to Anil Nal[l]uri, M.D., in March 2006, and she was diagnosed with Major Depressive Disorder due to feelings of depressed mood, sadness, anger, tearfulness, and worry about her health, future, and ability to car for herself. She treated with him for psychotherapy and psychiatric medication management.

* * *

As a function of the clinical interview and the review of the entire psychological content of Ms. Penny's BWC file, this examiner finds the [Injured Worker] to be permanently and totally disabled and not capable of engaging in any form of competitive gainful employment. She has no emotional stamina or capacity to tolerate a work setting and the requirements of same. She is PTD as a consequence of the medical impairments of this industrial injury as allowed by the ICO/BWC.

{¶ 27} 13. Relator had claimant examined by Robert G. Kaplan, Ph.D.  In his January 15, 2014 report, Dr. Kaplan identified the medical records which he reviewed and, after discussing them in significant detail, Dr. Kaplan concluded that: "Ms. Penny is not a reliable reporter of her psychological symptoms and impairments."  Dr. Kaplan concluded, at most, claimant has a mild (Class II) impairment of 15 percent.  Concluding that she was not permanently and totally disabled, Dr. Kaplan stated:

> With reasonable psychological certainty, it can be stated that:
>
> [One] In addition to having bonafide psychological and physical symptoms, Ms. Dieldra L. Penny is exaggerating her physical limitations. Therefore, she is not considered a reliable reporter of her physical limitations or psychological symptoms and impairments.
>
> [Two] The allowed psychological conditions of an industrial injury that occurred on 7/13/04, over nine years ago, have remained at Maximum Medical Improvement and do not require additional treatment, although Ms. Dieldra L. Penny has clinically significant symptoms of anxiety and depression that are being caused by financial stressors and ongoing enmity for the employer of record, which do require treatment.
>
> [Three] Ms. Dieldra L. Penny is not Permanently and Totally Disabled by the allowed psychological conditions of the industrial injury that occurred on 7/13/04.
>
> [Four] Ms. Dieldra L. Penny currently has a fifteen percent (15%) permanent partial disability due to the allowed psychological conditions of an industrial injury that occurred on 7/13/04.
>
> [Five] Ms. Dieldra L. Penny has no psychological condition or impairment that would prevent her from returning to her former position of employment, engaging in some other form of sustained remunerative employment, or participating in a vocational rehabilitation program, and does not require any restrictions due to her allowed psychological conditions.

{¶ 28} 14. Relator had claimant examined for the allowed physical conditions by Paul C. Martin, M.D.  In his December 5, 2013 report, Dr. Martin identified the allowed

conditions in the claim, the history of the claim, and the medical records which he reviewed. Dr. Martin provided his physical findings upon examination and ultimately concluded: claimant continues to experience ongoing residual difficulties related to the allowed physical conditions in her claim; those physical conditions had reached MMI; continued treatment for the allowed physical conditions would consist of medications to help manage her symptoms, the use of a cane and an AFO brace for ambulation, and various other tools to complete her daily self-catheterization for urinary incontinence. Dr. Martin concluded that claimant was physically capable of returning to work as follows:

> It is my medical opinion Ms. Penny is physically capable of working in a modified work environment which would be considered sedentary in nature. This would consist of no lifting greater than 10 pounds, avoidance of activities requiring frequent bending, twisting or stooping, and avoidance of any activities requiring prolonged periods of walking or standing. She would also need to avoid activities requiring kneeling, squatting or climbing. Additional accommodations will be necessary to allow Ms. Penny the opportunity to self-catheterize herself 3-5 times per day. This particular activity may be problematic in the public setting due to Ms. Penny's need to perform this activity in a clean/safe environment in an attempt to minimize the potential for infections. Considering this particular accommodation, it may be prudent for Ms. Penny to be employed in a capacity where she could work from home, thereby facilitating/meeting all previously recommended work restrictions/accommodations.

{¶ 29} 15. Finding that she was not permanently and totally disabled, Dr. Martin assigned a 44% whole person impairment. Despite the fact that he had opined claimant's limitations solely as a result of the allowed physical conditions in her claim rendered her unable to participate in sustained remunerative employment in his August 8, 2013 report, on February 3, 2014, Dr. Dunne referred claimant for a vocational rehabilitation assessment and, on February 13, 2014, relator referred claimant to Catalyst RTW ("Catalyst") for an evaluation.

{¶ 30} 16. In a letter dated March 5, 2014, claimant was notified that she had been referred to Catalyst and that she would be contacted soon.

{¶ 31} 17. Catalyst sent Dr. Dunne a job description for a home-based position which would offer claimant a flexible work schedule and the ability to work from whatever position was most comfortable for her to claimant's treating physician Dr. Dunne.

{¶ 32} 18. According to the job analysis form, the position would require the following:

> **JOB DESCRIPTION:** At Home Customer Survey Associate: From the home employee is responsible for making outbound calls to businesses in an attempt to gather survey information. Employee will complete a survey sheet (either on a computer or manually) for each connected call and will track total number of calls on a daily time tracking sheet. Paperwork is to be returned to the employer on a weekly basis (or with greater frequency as dictated by the project). Employee is responsible for eh accurate completion of all paperwork. All Facilities, Inc. offers a flexible schedule to enable employees to take breaks as needed. Employees are encouraged to utilize this flexibility to develop a work schedule that maximizes their productivity and comfort with the understand that they remain responsible to complete their assigned hours each week.
>
> Employee is expected to adhere to a minimum standard of 16 dials and 2 completed surveys per hour.
>
> **MACHINES & TOOLS REQ'D:** Cordless headset telephone, pens, and computer (when appropriate).

{¶ 33} 19. On March 11, 2014, Dr. Dunne responded that, in his opinion, claimant was physically capable of performing the position described for 20 to 30 hours per week.

{¶ 34} 20. In a letter dated March 18, 2014, Catalyst informed claimant's attorney about the program, stating:

> Gil Kuhrt of WC Consulting, Inc. has retained CATALYST RTW to assist your client, Dieldra Penny with her return to work efforts. We are pleased to inform you that Ms. Penny will be participating in our Return to Work Program, which will enable her to work from home while receiving extensive on-the-job training for a position that provides genuine opportunity with an exciting career path.

> Enclosed you will find a letter regarding an interview that we have scheduled for Ms. Penny for a home-based position as an At-Home Customer Survey Associate. We look forward to working with you and Ms. Penny on her successful reentry to the workforce. Please feel free to contact us if you have any questions.

{¶ 35} 21. In a letter of that same date, claimant was notified that Catalyst had "identified an employment opportunity for you, which falls within your physical limitation as established by Dr. John Dunne D.O." and that he was required to complete the enclosed application as well as participate in an upcoming interview with AllFacilities, which has "openings and will extend an offer of employment to you upon successful completion of the interview."  (Emphasis sic.)

{¶ 36} 22. The application indicated that the position was for an At-Home Customer Survey Associate working 30 hours per week and that she would be paid $9 per hour.  Claimant would be required to complete 16 dials per hour per work day and her goal was to obtain two "A" leads per hour.

{¶ 37} 23. Claimant received a follow-up letter from Catalyst dated March 31, 2014 congratulating her on her new position and informing her that training would take place on Monday, April 7, 2014, at which time she would receive all the equipment necessary to provide the duties of the job prior to her training.

{¶ 38} 24. Apparently claimant had some difficulties with the equipment she received and was provided new equipment.

{¶ 39} 25. Thereafter, in a letter dated April 16, 2014, AllFacilities, Inc. indicated:

> The following letter is regarding your present employment at AllFacilities, as an At-Home Customer Survey Associate. You accepted this position on March 31, 2014 in the capacity of 30 hours a week.
>
> We have not heard from you since April 8th, when you claimed that your phone was not working. Since that time you were sent a new phone via Federal Express that was delivered on Friday, April 11, 2014. You have not set up this phone nor have you attempted to contact our office for assistance. AllFacilities has made several attempts to contact you on both your personal and work phone numbers. WE called you on April 14th, 15th and 16th leaving several

messages, when your personal phone was able to receive them, the voicemail box was full most of the time. Unfortunately, AllFacilities has not received a call back.

The position with AllFacilities remains available to you. Please contact the office by **Thursday, April 24, 2014** to move forward and reschedule your training. In absence of a valid medical or other excuse it must assume that you have abandoned your position.

(Emphasis sic.)

{¶ 40} 26. In a follow-up letter to claimant's attorney dated April 25, 2014, Catalyst assured claimant's attorney that certain concerns claimant had regarding recording or monitoring devices being placed on her home telephone were unwarranted.

{¶ 41} 27. After an April 8, 2014 exam, Dr. Dunne issued a report dated April 10, 2014, indicating that claimant was unable to perform the job which had been offered to her:

Gathering contemporary data on her activities of daily living limitations, the combination of the impairment from her medications interferes with activities of daily living due to the fecal and urinary incontinence and multiple showers necessary for self-care, I think that I have a better picture of her daily limitations, and at this point, I believe I can state, to a reasonable degree of medical certainty, that she cannot meet the job demands as described previously and I really don't think that she is able to participate in any type of remunerative employment activities because of the demands of her own personal care and the mild impairment due to her medications. I also think that she is profoundly depressed. In speaking with her today in comparison to how I first knew her, a very vibrant and outgoing personality as we moved through a definitive diagnosis and initial surgery with all of the expectations that should would [sic] recover. But ultimately, it was too late on the delayed diagnoses and the cauda equina syndrome and the lower extremity radiculopathy never improved, and this has had a very profound impact on her life and on her psychologically.

{¶ 42} 28. In a letter dated April 15, 2014, Dr. Weinstein discussed his recent exam of claimant and the At-Home Customer Survey position she had been offered. Dr. Weinstein noted that claimant expressed fear and anxiety about being surveilled and

specifically noted that her status had deteriorated greatly since he last saw her on December 17, 2013.  Dr. Weinstein noted:

> As a consequence of this "vocational training," she has had an increase in her anxiety levels, an increase in her incontinence and pain, and a residual depressive reaction to both. Ms. Penny has been placed in a program (it is not clear if there is any legitimate training or orientation) that allows for working at home but creates a number of fears and anxiety as a result of the nature of the work. Apparently, she is to be doing cold calls selling an unknown product. She is anxious about what the product is exactly and she is extremely anxious about comments her "trainer" has made about Ms. Penny's home phone being monitored (apparently Ms. Penny installs an attachment to her home phone so that the "trainer" can monitor her calls-raising fear in both Ms. Penny and her husband as to "what else can they monitor.")

> Ms. Penny presented with increased levels of anhedonia and depression. She cried throughout much of our meeting while she discussed the "vocational" program and as she described her increase in her physical symptoms.

> * * *

> Ms. Penny continues to be an emotional mess and has no capacity (as noted in my December 2013 report), to function in a work setting either at home or outside of the home. Ms. Penny has been forced to confront these limitations by this "program" she has had laid on her, resulting in an increase in her symptoms per her report in our session last week.

> Again, let me reiterate, I believe Ms. Penny is incapable of performing this or any other job, and I consider Ms. Penny to be permanently and totally disabled and not capable of any form of gainful competitive employment. This is due to her emotional status and the impairments of Major Depressive Disorder Single Episode Mild; Anxiety Disorder due to cauda equina syndrome with neurogenic bowel and bladder disorder.

{¶ 43} 29.  Apparently, relator again had claimant under surveillance.  The report indicated that claimant was observed doing the following:

> The surveillance report of 12/4/13 indicates that Ms. Penny [w]as observed walking in a "fluid like manner utilizing a

cane in her right hand. The subject bent slightly at the knees; retrieved an object on the ground then stood back up straight; and walked out of view into the main entrance," of the my [sic] office building. On 12/13/13, she was observed backing a car into her garage. On 12/24/13, Ms. Penny was observed X-mas shopping at a Sam's Club, wearing a "Santa hat." It was noted that she "pushed the shopping cart in a quick fluid-like manner with no signs of distress; no signs of any braces or supports; and no assistance of a walking cane. The subject [Ms. Penny] bent slightly over into the shopping car; carried a purse in her left hand and the walking cane in her right hand; walked around the passenger side of the vehicle and out of view. Mr. Penny was observed loading grocery items into the vehicle; and the subject [Ms. Penny] was observed again pulling the shopping car; then out of view." She was also observed to be "bent slightly over the shopping car to retrieve a known item," and "was observed walking in heeled boots or shoes."

{¶ 44} 30. In a report dated March 14, 2014, Dr. Kaplan opined that Dr. Weinstein's report was not based on any scientific system of impairment rating, but that it was his subjective clinical judgment and that, in his opinion, claimant was not permanently and totally disabled.

{¶ 45} 31. The commission asked Richard J. Reichert, M.D., to examine claimant concerning her allowed physical conditions. In his May 20, 2014 report, Dr. Reichert identified the allowed conditions in claimant's claim as well as the medical records and surveillance video he was provided, concluded claimant had reached MMI for her allowed physical conditions, assigned a 55 percent whole person impairment, and concluded that claimant could perform sedentary work but would require frequent breaks to attend to her personal hygiene matters.

{¶ 46} 32. Regarding her allowed psychological conditions, the commission had claimant examined by David L. Chiarella, Ph.D. In his May 28, 2014 report, Dr. Chiarella identified the allowed conditions in claimant's claim, identified the medical records which he reviewed, as well as his observations. He administered the MMPI-2RF and BDI-II tests, and, based on testing results as well as his interview, Dr. Chiarella noted the following:

**Activities of Daily Living:** * * * The injured worker has sustained a Class-3 moderate impairment in her activities of daily living related to her allowed psychological conditions.

**Social Functioning:** The injured worker reported a lack of desire to interact with others on a regular basis. She does attend church two time a week. * * * Her primary social contacts are with her husband, children and persons at church. * * * Reportedly, the injured worker leaves her home for medical and physician appointments, various errands, church and on occasions, grocery shopping. The injured worker has sustained a Class-3 moderate impairment in her social activities related to the allowed psychological conditions.

**Concentration, Persistence and Pace:** The injured worker reported difficulty concentrating and attending. * * * She was able to attend and concentrate to complete the MMPI-2RF. The injured worker has sustained a Class-2 mild impairment in her ability to attend, concentrate and persist in goal directed activity.

**Adaptation:** The injured worker continues to report and the psychological test data indicate, that she continues to experience clinically significant depressed and anxious symptoms. The injured worker is reporting significant feelings of anxiety, nervousness, agitation and feelings of panic. She also reported pervasive feelings of sadness, anhedonia, loss of interest in activities and other s as well as feelings of pessimism, discouragement and hopelessness. The injured worker is demonstrating a low tolerance for stress and frustration  She has sustained a Class-3 moderate impairment in her ability to adapt to stressful life circumstances related to the allowed psychological conditions.

{¶ 47} Ultimately, Dr. Chiarella assessed a 35 percent whole person impairment and opined that claimant was permanently and totally disabled, stating:

The injured worker [is] incapable, due to the allowed psychological conditions of a Major Depressive Disorder and Anxiety Disorder Due to Cauda Equina Syndrome with Neurogenic Bladder to sustain remunerative employment; she is considered permanently and totally impaired. The severity, nature and extent of her anxiety as well as depression would interfere with her ability to attend on a

regular basis, even on a limited basis. The injured worker's stress tolerance would interfere with her ability to attend, concentrate and persist in goal directed activity on a regular basis, even with repetitive activities. The injured worker would experience difficulty interacting with others in the workplace including co-workers' and supervisors.

{¶ 48} 34. Claimant's application for PTD compensation was heard before a staff hearing officer ("SHO") on September 15, 2014. Based upon the April 15, 2014 report of Dr. Weinstein and the May 28, 2014 report of Dr. Chiarella, the SHO concluded that claimant was permanently and totally disabled solely as a result of the allowed psychological conditions in her claim. At the hearing, relator argued that claimant was not eligible for PTD compensation because she had not engaged in either educational rehabilitative efforts to enhance her employability or following through on the return to work program offered her. Relator argued that claimant had not exhausted all efforts to return to some sustained remunerative employment and PTD compensation should be denied. The SHO specifically rejected relator's argument citing testimony from the hearing and stating:

> The Staff Hearing Officer finds that this [sic] argument to be flawed for several reasons. First, neither the Employer nor its agent (Catalyst RTW) contacted the Injured Worker's <u>treating psychologist</u>, Dr. D. Weinstein, Ph.D., to determine if the Injured Worker could perform the type of activities required in the light duty job offer rom a psychological standpoint. This is evidenced by the testimony of Renee Wallace of Catalyst RTW at hearing. * * *

> The above testimony clearly indicates that Ms. Wallace, of Catalyst RTW, contacted only the Injured Worker's treating physician for the allowed physical conditions in this claim, Dr. J. Dunne, D.O., when arranging for the Injured Worker to perform light duty work. The Injured Worker's treating psychologist, Dr. D. Weinstein, Ph.D., was not contacted with concern to this Injured Worker's psychological ability to return to light duty work. Dr. Weinstein never had the opportunity to review and/or approve the light duty job offered to the Injured Worker by Ms. Wallace through Catalyst RTW. Thus, the Staff Hearing Officer concludes that the offer of light duty work failed to adequately address the

limitations pressed by the allowed psychiatric conditions of this claim.

The Staff Hearing Officer also concludes that had Ms. Wallace contacted Dr. Weinstein, she would have discovered in all likelihood that he would not have approved any light duty work for this Injured Worker. In fact, as early as 04/15/2014, Dr. Weinstein generated a report indicating that the Injured Worker did not possess the retained functional capacity to do *any* work. Given that the light duty job was made available on 4/07/2014 without any input from the treating psychologist (Dr. Weinstein) as to whether the Injured Worker could perform this activity, the Staff Hearing Officer rejects the Employer's argument that this offer was good faith offer of light duty work. To accept this Employer's argument that this Injured Worker's [sic] is ineligible for permanent total disability benefits on the basis of an insufficient attempt at educational or rehabilitative efforts would be manifestly unfair under these circumstances.

The Employer's argument challenging PTD eligibility on this basis fails for a second reason as well. Notably, Ohio Revised Code Section 4123.58 (D)(4) provides that permanent total disability shall not be compensated if the "Employee has not engaged in educational rehabilitative efforts to enhance the employee's employability, ***unless such efforts are determined to be in vain***."(Emphasis added.) In the claim at hand, the Staff Hearing Officer finds that this Injured Worker's participation in educational or rehabilitative efforts would have been in vain as her treating psychologist concluded that the Injured Worker did not have the retained psychological capacity to perform any type of work as of April 2014[,] the same month in which the light duty position was made available to this Injured Worker. Thus, this Injured Worker's failure to comport with the Employer's request to perform light duty work becomes irrelevant in the adjudication of this Injured Worker's permanent total disability benefit eligibility.

For all of the foregoing reasons, the Injured Worker's Application for Permanent Total Disability Benefits, filed 10/30/2013, is granted to the extent of this order.

(Emphasis sic.)

{¶ 49} 35. Relator's request for reconsideration was denied and, thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 50} For the reasons that follow, it is this magistrate's decision that this court should deny relator's request for a writ of mandamus.

{¶ 51} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 52} The relevant inquiry in a determination of permanent total disability is claimant's ability to do any sustained remunerative employment. *State ex rel. Domjancic v. Indus. Comm.*, 69 Ohio St.3d 693 (1994). Generally, in making this determination, the commission must consider not only medical impairments but also the claimant's age, education, work record and other relevant non-medical factors. *State ex rel. Stephenson v. Indus. Comm.*, 31 Ohio St.3d 167 (1987). Thus, a claimant's medical capacity to work is not dispositive if the claimant's non-medical factors foreclose employability. *State ex rel. Gay v. Mihm*, 68 Ohio St.3d 315 (1994). The commission must also specify in its order what evidence has been relied upon and briefly explain the reasoning for its decision. *State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991).

{¶ 53} Relator raises the following arguments: (1) it was an abuse of discretion for the SHO to find that relator was required to seek approval from claimant's treating psychologist before beginning a vocational rehabilitation program, and (2) claimant's

material misrepresentations to Dr. Weinstein about her abilities rendered his report unreliable.

{¶ 54} As indicated in the findings of fact, Dr. Dunne, who had been treating claimant for her allowed physical conditions, referred her for a vocational rehabilitation assessment in February 2014. Thereafter, relator referred claimant to Catalyst who sent Dr. Dunne a copy of the job analysis form describing the at home position being made available to claimant and asking if he believed she was capable of performing those duties. Dr. Dunne responded that, in his opinion, she was capable.

{¶ 55} Despite the fact that claimant's claim was allowed for significant psychological conditions and relator knew the physician with whom claimant was treating, neither relator or Catalyst contacted Dr. Weinstein to ask him whether or not claimant was capable of performing the job responsibilities being offered her.

{¶ 56} In arguing that the commission abused its discretion, relator argues that the commission treated the vocational rehabilitation program as a job offer and analyzed the situation from the context of the necessity for approval from an injured worker's physician of record before making an offer of light duty or other suitable employment to an injured worker and the termination of TTD compensation. Relator asserts it was not required to seek Dr. Weinstein's approval and, even if Dr. Weinstein would have disapproved, his disapproval would have been based on claimant's misrepresentations to him, the same misrepresentations which should, in relator's opinion, remove Dr. Weinstein's report from evidentiary consideration.

{¶ 57} Relator asserts that because this was rehabilitation and not an offer of employment, there was no requirement to first seek approval from claimant's treating physicians. However, the magistrate notes that it was the doctor treating claimant for her allowed physical conditions who referred her to vocational rehabilitation and he did not consult with nor did he consider the allowed psychological conditions in her claim. How could relator simply ignore the fact that claimant had significant psychological conditions and had restrictions based on those allowed psychological conditions?

{¶ 58} Although relator vehemently maintains that this was a rehabilitation program and not an offer of employment, every letter from Catalyst indicates that this was indeed an offer of employment being made to claimant. As above noted, claimant

was interviewed and notified that she had a new position with AllFacilities and would begin her training on Monday, April 7, 2014. AllFacilities sent claimant paperwork indicating that her rate of pay would be $9 per hour. By all accounts, it does appear that an offer of employment was made to claimant and relator's argument that approval from her treating physician is not necessary before she began vocational rehabilitation is rather disingenuous. Relator knew claimant had significant psychological conditions and, in making this job offer, should have contacted Dr. Weinstein.

{¶ 59} In the present case, the commission awarded claimant PTD compensation based solely on her allowed psychological conditions. In so doing, the commission relied on two pieces of evidence: the February 15, 2014 report of Dr. Weinstein and the May 28, 2014 report of Dr. Chiarella. It is undisputed that, when the commission determines that a claimant is entitled to an award of PTD compensation based solely on the allowed conditions in the claim, the commission is not required to analyze the non-medical disability factors under *Stephenson.* Further, the commission can determine, based on the evidence before it, that a claimant was not capable of participating in vocational rehabilitation thereby obviating the need for a claimant to have first sought out vocational rehabilitation before applying for PTD compensation. The commission can find that such action would be in vain. *See* R.C. 4123.58(D)(4) and *State ex rel. Galion Mfg. Div. Dresser Industries, Inc. v. Haygood*, 60 Ohio St.3d 38 (1991).

{¶ 60} Relator does not offer any challenges to the May 28, 2014 report of Dr. Chiarella to whom the commission referred claimant for an examination and evaluation of her allowed psychological conditions. As noted in the findings of fact, Dr. Chiarella administered various testing, interviewed claimant, and reviewed medical reports submitted to him. Thereafter, Dr. Chiarella opined that claimant was incapable of working, stating:

> The injured worker [is] incapable, due to the allowed psychological conditions of a Major Depressive Disorder and Anxiety Disorder Due to Cauda Equina Syndrome with Neurogenic Bladder to sustain remunerative employment; she is considered permanently and totally impaired. The severity, nature and extent of her anxiety as well as depression would interfere with her ability to attend on a regular basis, even on a limited basis. The injured worker's

stress tolerance would interfere with her ability to attend, concentrate and persist in goal directed activity on a regular basis, even with repetitive activities. The injured worker would experience difficulty interacting with others in the workplace including co-workers' and supervisors.

{¶ 61} Even if this court finds the report of Dr. Weinstein does not constitute some evidence upon which the commission could rely to award claimant PTD compensation, the report of Dr. Chiarella, standing alone, supports the commission's order thereby negating relator's argument that this court must issue a writ of mandamus, and renders discussion of relator's other argument immaterial.

{¶ 62} Despite the fact that this magistrate concludes that there is an independent basis upon which this court can and should find that the commission did not abuse its discretion in awarding claimant PTD compensation, the magistrate will address relator's second argument.

{¶ 63} First, the magistrate notes that relator's second argument is based in part on relator's theory that, since claimant was, at one time, found to have been exaggerating her symptoms and TTD compensation was accordingly terminated, she has continued exaggerating her symptoms to Dr. Weinstein and, as such, his report cannot constitute some evidence upon which the commission could rely.  In making this argument, relator argues that the following surveillance demonstrates that claimant was again exaggerating her symptoms.  On December 24, 2013, claimant was observed as a passenger in the front seat of an automobile being driven by her husband and claimant was seen wearing a red Santa hat.  Claimant was also observed pushing a shopping cart in what the investigator described as a fluid-like manner with no signs of distress and no assistance from her walking cane.  On a different day, claimant was again observed walking in a fluid-like manner, but utilizing a cane.  Apparently, she bent slightly at the knees and retrieved an object from the ground.

{¶ 64} The magistrate fails to see how the above activities demonstrate that claimant was again exaggerating her symptoms thereby warranting the removal of Dr. Weinstein's report from evidentiary consideration.  Further, as stated previously, even if this report is removed from evidentiary consideration, the commission's order is supported by some evidence and is not contrary to law.

{¶ 65} Second, when the commission determines that vocational rehabilitation would be in vain, a claimant is excused from pursuing such avenues prior to be awarded PTD compensation.  Here, the commission specifically found that claimant's attempts at rehabilitation would have been in vain and, as such, relator's argument fails.

{¶ 66} Based on the forgoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion in awarding claimant permanent and total disability compensation and this court should deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).